**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

LISSA HOSTOMSKY, as Personal Representative of the Estate of EDWARD C. TOWNSEND, III, for the benefit of Lissa Hostomsky, surviving parent, Edward C. Townsend, Jr. surviving parent, and The Estate of EDWARD C. TOWNSEND, III,

Plaintiff,

v. Case No: 5:24-cv-497-JSM-PRL

BILLY WOODS, in his official capacity as Sheriff of Marion County, Florida; DAVID BURGESS, in his individual capacity; and ASHLYN WHELCHEL, in her individual capacity,

Defendants.

---

# ORDER

This cause is before the Court upon the parties' Motions for Summary Judgment. The Court, having reviewed the motions, responses, replies, record evidence, and being otherwise advised in the premises, concludes that the motions should be denied in their entirety because there are genuine issues of fact for the jury to determine whether Defendants violated Edward Townsend's civil rights.

## FACTUAL BACKGROUND

This is a civil action arising out of the alleged wrongful death of Edward C. Townsend, III and asserting causes of action against Defendants for wrongful death and violations of Edward C. Townsend, III's civil rights under the United States Constitution,

specifically the Fourth Amendment thereto; violations of 42 U.S.C. §§ 1983, 1988; and violations of Florida Statutes and common law. Plaintiff Lissa Hostomsky is the duly appointed Personal Representative of Edward C. Townsend, III's Estate.

Defendant Billy Woods is the Sheriff of Marion County, Florida, a political subdivision of the State of Florida. Defendants David Burgess and Ashlyn Whelchel were law enforcement officers employed by the Marion County Sheriff during the relevant time.

The record reflects that on December 29, 2022, Edward C. Townsend, III, (hereinafter "Townsend" or "Decedent") was visiting his mother, Plaintiff Lissa Hostomsky, at her home located at 17117 SE 71st Lewisfield Terrace, in The Villages for Christmas. At approximately 9:33 p.m., Townsend called 911 to report that he wanted law enforcement assistance to help him retrieve his car keys from his mother's home so that he could return to his residence in South Carolina. During the 911 call, Townsend explained that his uncle was physically pushing him around and his stepfather was threatening him.

Deputy Burgess arrived on scene and, instead of making contact with Townsend, proceeded directly to the home. Deputy Burgess did not wait for backup. Deputy Burgess did not attempt to talk to Townsend, even though he had placed the 911 call and requested assistance. Deputy Burgess began banging on the window and doors of the home, but no one answered. He then began to walk back to his police cruiser at which point he noticed Townsend walking in his direction. Deputy Burgess asked Townsend if he was the one that called 911 and Townsend replied yes. Townsend had his hands outstretched toward Deputy Burgess in a non-threatening manner.

The record contains video recordings of the subsequent events, which the Court has reviewed. The recordings reveal that Deputy Burgess, without asking Townsend any questions, aggressively demanded that Townsend: "come here." Townsend complied with Deputy Burgess's order to come to him. Without being prompted, Townsend held his hands out to his side with his hands open and empty. Townsend was friendly and greeted Deputy Burgess. Upon contact, Deputy Burgess instructed Townsend to turn around and Townsend complied and placed his hands behind his back.

While keeping his hands behind his back, Townsend turned his head and shoulders slightly as he told Deputy Burgess that he wished to call his attorney. Deputy Burgess had difficulty handcuffing Townsend because Townsend was wearing a long-sleeved shirt and dropped his handcuffs. Deputy Burgess told FDLE investigators that Townsend began to pull away and turn around, but Deputy Burgess's body-worn camera recording refuted Deputy Burgess's version and instead showed Townsend being compliant as he spoke. Deputy Burgess firmly grabbed Townsend and sternly told him, "Do not fucking move!" Townsend complied and stood still with his hands behind his back as Deputy Burgess reached down and picked up his handcuffs from the ground.

Deputy Burgess testified, "So my vehicle was probably maybe from here to the door in the conference room, so I took him and put him against my vehicle to try to gain some leverage to safely handcuff him. At that point, he continued to actively resist and tried to, he was like asking me what was going on, and he was actively pulling away from me." A review of Deputy Burgess's body-worn camera failed to reveal any active resistance on the part of Townsend.

The last verbal command by Deputy Burgess was, "Do not fucking move." Townsend complied and did not move as instructed when Deputy Burgess began to push Townsend forward while bending him at the waist with one arm while holding his wrists with the other arm. This action caused Townsend to unexpectedly move forward with his head leading his body toward the vehicle. Deputy Burgess provided no verbal direction. As Deputy Burgess pushed Townsend into the car, Townsend continued to keep his hands behind his back and called out to Deputy Burgess, "Whoa, whoa, whoa, whoa, whoa." Townsend asked what he was doing wrong.

Deputy Burgess testified, "I kept telling him to stop resisting, stuff like that; I think I said something like, you keep resisting, and we're going to end up on this concrete." Deputy Burgess's body-worn camera recording does not indicate that he told Townsend to stop resisting.

Defendant Deputy Whelchel pulled up in her vehicle and saw Townsend and Deputy Burgess standing at the side of Burgess's vehicle. Deputy Whelchel thought they were conversing until she got out of her vehicle and noticed that Deputy Burgess was attempting to handcuff Townsend. As Deputy Whelchel approached the scene, her body-worn camera captured Townsend pressed up against the marked SUV. Townsend was heard saying, "Am I going to eat this concrete?" Deputy Whelchel immediately intervened and grabbed Townsend's left arm. Deputy Burgess grabbed Townsend's right arm.

Townsend continued to tell the deputies that he hadn't done anything wrong. Townsend continued to stand with his body tensed and his arms extended. Townsend reacted as if he was experiencing pain and cried out. At this exact moment, the right hand

of Deputy Burgess was observed contacting the right side of Townsend's abdomen with a closed fist. Subsequently, Deputy Burgess's body-worn camera fell onto the pavement, capturing only audio evidence from this point.

According to Lissa Hostomsky, she observed the male deputy punching her son like he was a "punching bag." The deputies ignored Mrs. Hostomsky, who informed them that Mr. Townsend was her son and requested that they stop.

Deputy Burgess confirmed that he had punched Townsend in the stomach and told FDLE investigators, "Then he got pretty angry and turned, went to turn around and bow up on me, so I hit him in the right abdominal area to try and gain pain compliance." But the record contains evidence that Townsend was turned away from Deputy Burgess when Burgess was punching him. Deputy Burgess issued no verbal commands or warnings prior to punching Townsend. Deputy Burgess testified that after punching Townsend, "He completely turned around, and he grabbed me," which is contradicted in the record.

The audio reflects that Deputy Whelchel says, "Hold on, I am getting my Taser." Mrs. Hostomsky asks, "What's happening?" to which Townsend replied, "He's hitting me." According to Deputy Burgess, Deputy Whelchel warned Townsend he was about to be tased. The deputies' body-worn camera audio recording does not reflect any warning. Deputy Whelchel placed her taser against Townsend's abdomen and activated it in drive-stun mode. The sound of multiple taser activations was captured on Deputy Whelchel's body-worn camera as Townsend cried out in pain. According to the Axon Taser 7 CEW Log, the taser was activated 5 times in arc mode.

Deputy Whelchel alleged that prior to using her taser, "I grab my Taser, Burgess tells him, you're going to get Tased, and the guy says no, so I drive-stunned him in the abdomen." However, in her preliminary statement, Deputy Whelchel did not offer testimony of any warnings that Deputy Burgess provided to Townsend. No warning was captured on either of the deputies' body-worn camera recordings.

Deputy Burgess further contradicted the testimony of Deputy Whelchel and told investigators that it was Deputy Whelchel who issued warnings to Townsend that he was going to be tased. Whelchel did not articulate why she continued to drive-stun Townsend without providing him with any additional orders or why she did not give Townsend an opportunity to comply after each use of force.

After Deputy Whelchel grabbed her taser and drive-stunned Townsend in his abdomen five times she yells to Deputy Burgess that Townsend has her taser. The record reflects evidence that Townsend never had control over her taser. Even though Deputy Burgess could not see any threat, he drew his service firearm and shot Townsend in the lower back without any warning. It was approximately 64 seconds from the time Defendant Burgess encountered Townsend until the time he shot him. Townsend subsequently died as a result of the gunshot to his back.

Mrs. Hostomsky witnessed the shooting and provided a sworn statement to investigators. Mrs. Hostomsky advised that she was so close to the deputies that she was nearly knocked over by Deputy Burgess and Mr. Townsend as they fell to the ground. Mrs. Hostomsky refuted any claims that her son grabbed Deputy Whelchel's taser. According to Mrs. Hostomsky, Mr. Townsend was tased on his right side, and his hands

went to the area where the taser had contacted his body. Mrs. Hostomsky advised that the taser was never in her son's hands as Deputy Whelchel claimed. According to Mrs. Hostomsky, "And there was no way that he had, you know, that Taser in his hands, there's no way." Mrs. Hostomsky advised that Deputy Burgess immediately reacted by shooting her son. In her sworn statement, Mrs. Hostomsky said, "As soon as she said, he got my Taser, he pulled the gun and shot."

Deputy Whelchel's Taser Model 7 (Serial # X4000E48H) was submitted to the FDLE laboratory for latent processing. The results of the examination were documented in a January 11, 2023, report by Crime Laboratory Analyst Kelsey Stover. While it was reported that Mr. Townsend grabbed Deputy Whelchel's taser, Mr. Townsend's latent fingerprints were not recovered from its surface.

The Amended Complaint alleges Section 1983 claims against all Defendants related to the violation of Townsend's constitutional rights under the Fourth Amendment. The Amended Complaint also alleges related Florida claims for wrongful death and battery.

While all parties move for judgment as a matter of law, the record reflects that the parties rely on different versions of the facts and a jury must therefore determine whether the Deputies and the Sheriff acted in violation of Townsend's civil rights. Indeed, the record shows that the deputies made numerous inconsistent statements about the events directly preceding Deputy Whelchel's use of her taser and Deputy Burgess shooting Townsend in the back. Plaintiff's expert report describes in detail these inconsistencies.

Plaintiff's expert report also discusses in detail the Sheriff's failure to adequately train and discipline its deputies, including Whelchel and Burgess, which was a systemic

problem. Of course, Defendants' expert offers a contrary opinion. Because the record is clear that the claims must go to trial, the Court briefly touches upon some of the issues.

## SUMMARY JUDGMENT STANDARD

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual

issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984).

## **DISCUSSION**

"Claims of excessive force are to be judged under the Fourth Amendment's 'objective reasonableness' standard." *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009) (quoting *Brosseau v. Haugen,* 543 U.S. 194, 197 (2004)). Courts are to consider whether an officer's use of force is reasonable in light of the facts confronting the officer

on the scene "rather than with the 20/20 vision of hindsight." *Id.* So, courts must weigh the facts of each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Other considerations are "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically." *Id.* Force is excessive when the amount and degree surpass what is "necessary in the situation at hand." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002).

With respect to a duty to intervene: "An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Velazquez v City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2002) (quoting *Skritch v Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002)).

Starting with Deputy Whelchel, there is an issue of fact regarding her alleged constitutional violations and qualified immunity is not applicable under this record. To briefly summarize, and as Plaintiff's expert highlights, Whelchel arrived on scene and made no attempt to stop Deputy Burgess from continuously punching Townsend even after Townsend's mother ran out and begged him to stop. Deputy Whelchel tased Townsend approximately five times without providing him with any warning.

As for Deputy Burgess, while he characterized Townsend as resisting him, the record reflects that Townsend attempted to comply with Burgess's commands and a jury could find that Townsend did not act aggressively. Deputy Burgess never attempted to

pat Townsend down for weapons. Deputy Burgess kneed and punched Townsend. Deputy Burgess made multiple inconsistent statements that are contradicted by the audio. Deputy Burgess shot Townsend in the back when the evidence reflects that Townsend did not have Whelchel's taser. Burgess did not consider deploying his own taser.

In sum, with respect to the claims against the individual deputies, a jury could conclude that Townsend was doing nothing wrong, Townsend was not armed, Townsend called 911 to receive assistance from law enforcement, neither deputy asked Townsend if he was armed, neither deputy attempted to pat Townsend down for weapons, or do anything to deescalate the situation. They also ignored Townsend's mother when she begged them to stop, and they ignored Townsend's constant questions/statements of "what did I do" and "I didn't do shit." For these same reasons, the Florida claims survive summary judgment.

With respect to the Sheriff's liability, Plaintiff's expert report creates an issue of fact regarding the Sheriff's inadequate use of force policies and systemic problem of failing to train and appropriately discipline its deputies, including Burgess and Whelchel. *See* (Dkt. 43-5).

Finally, for the reasons already discussed, there is also an issue of fact regarding the Sheriff's vicarious liability for the actions of Burgess and Whelchel under the Florida Wrongful Death Act.

In sum, all of the claims must be determined by the jury and no party is entitled to judgment as a matter of law. It is therefore **ORDERED AND ADJUDGED** that the parties' motions for summary judgment (Dkts. 39, 40, 41, and 42) are denied.

**DONE** and **ORDERED** in Tampa, Florida, this October 29, 2025.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record